UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KIMBERLY MOONEYHAN,      )
                                               )
                Plaintiff,     )
                                               )
v.                                )     Case No.  1:16 CV 118 ACL
                                             )
TELECOMMUNICATIONS      )
MANAGEMENT, LLC, D/B/A       )
NEWWAVE COMMUNICATIONS,   )
                                             )
                Defendant.   )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment.

(Doc. 26.)  Plaintiff has filed a Response (Doc. 29) and Defendant has filed a Reply (Doc. 33).

For the following reasons, the motion is granted.

I.     **Background**

On June 2, 2016, Defendant removed this matter from the Circuit Court of Scott County,

Missouri, to this Court based on federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1441(a).  In Count I of her Complaint, Plaintiff Kimberly Mooneyhan alleges a hostile work

environment claim based on gender in violation of 42 U.S.C. § 2000(e) *et seq*., Title VII of the

Civil Rights Act of 1964.  Count II of the Complaint asserts a common law hostile work

environment claim based on Mooneyhan's gender.[1]  Mooneyhan's claims arise from her

---

[1]Mooneyhan conceded the dismissal of Count II due to her failure to comply with the
requirements of the Missouri Human Rights Act.  The Court dismissed Count II in an Order
dated October 17, 2016.  (Doc. 15.)

employment at Defendant Telecommunications Management, LLC, d/b/a NewWave Communications ("NewWave") from April 15 to July 6, 2014.[2]

On July 10, 2017, NewWave filed the instant Motion for Summary Judgment claiming entitlement to judgment as a matter of law on Mooneyhan's claims for the following reasons: (1) Mooneyhan is unable to demonstrate that she suffered a tangible employment action or constructive discharge; (2) Mooneyhan is unable to make a prima facie case of hostile work environment under Title VII because she cannot show the alleged harassment was "severe or pervasive" and did not give management the opportunity to prevent or correct any alleged harassment; and (3) because the alleged harassers are not Mooneyhan's "supervisors" and she suffered no tangible employment action, the *Faragher-Ellerth* affirmative defense applies.

Mooneyhan opposes NewWave's Motion for Summary Judgment, and argues that genuine issues of material fact exist that should be resolved by a jury. Mooneyhan cites the following examples of disputes of material fact: whether she was constructively discharged or if she was terminated pursuant to an attendance policy, whether the harassment she suffered was sufficiently severe or pervasive, and whether NewWave knew or should have known of the harassment at issue in this case.

## II.     Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

---

[2] The parties dispute whether Mooneyhan resigned on July 6, 2014, or she was terminated on July 8, 2014. Regardless, Mooneyhan last reported for work at NewWave on July 6, 2014.

After the moving party discharges this burden, the nonmoving party must do more than show there is doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must set forth specific facts showing there is sufficient evidence in her favor to allow a jury to return a verdict for her. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324.

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir. 2000). Finally, the court must resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

## III.    Facts[3]

NewWave is a broadband and cable company that provides residential and business cable, internet, and telephone services to customers in seven states across the Midwest and South. The events at issue took place in NewWave's Contact Center in Sikeston, Missouri. Mooneyhan worked at the Sikeston Contact Center as a Sales and Service Associate ("SSA") in the Billing Department beginning on April 15, 2014. Mooneyhan's position was part-time, and she worked approximately 25 hours per week.

---

[3]The undisputed facts are taken from facts that (1) Mooneyhan admitted were undisputed in her Response or (2) Mooneyhan alleged were disputed but failed to properly and/or directly controvert. The movant's statement of facts are deemed admitted if not specifically controverted by the party opposing the motion with specific references to portions of the record as required by Local Rule 4.01(E) and Federal Rule of Civil Procedure 56(c)(1).

*Anti-Harassment Policy*

At the outset of her employment, Mooneyhan acknowledged receipt of the Employee Handbook, which contains NewWave's anti-harassment policy. Mooneyhan understood that the policy prohibited harassment and discrimination of all forms. The policy requires an associate who feels he or she is a victim of sexual harassment to "bring the matter to the immediate attention of the supervisor in charge of the location/department at which he or she is employed within seven (7) calendar days." (Doc. 28-1 at 6.) It further provides that an associate "who is uncomfortable for any reason in bringing such a matter to the attention of this individual, or who is not satisfied that bringing the matter to the attention of such person will resolve the matter, should report the matter to the Human Resources Manager by phone or letter." *Id.* Mark Whitehead, Director of Operations; and Treka Hargrove, General Manager for Call Center Services; were supervisors in charge of the department/location at the Contact Center in Sikeston. Staci Gowan was the Human Resources (HR) Director for the Sikeston Contact Center in 2014.

*Attendance Policy*

In 2014, NewWave maintained a written no-fault attendance policy. The policy operates on a point system and is enforced through progressive discipline. When an employee accrues five points, a verbal warning is issued; six points begets a written warning; and seven points incurs a final warning. Upon the accumulation of eight points in a rolling calendar year, employment is terminated. The policy states that whether or how to assess progressive discipline is not discretionary. The most serious infraction, a "no-call/no show," incurs two points under the policy. Two consecutive "no-call/no-shows" are deemed job abandonment and a voluntary resignation by the employee. Attendance points are logged by the Contact Center Administrative

Assistant. The attendance policy was included in NewWave's Employee Handbook in effect during Mooneyhan's employment, receipt of which Mooneyhan acknowledged. Mooneyhan admits that she understood the attendance policy and disciplinary process.

### *Mooneyhan's Communications with NewWave Employees Regarding Attendance*

On May 22, 2014, Mooneyhan spoke with Sales and Service Lead Brandon Lawrence about her then-accumulated attendance points. According to NewWave's records, she had accumulated 1.5 points for an absence, about which Lawrence notified her. After the discussions with Lawrence, Mooneyhan emailed Director of Operations Mark Whitehead with a question that Lawrence could not answer. Mooneyhan concluded the email to Whitehead with a smiley-face emoticon. As of June 27, 2014, based on tracking of her absences, Mooneyhan had accrued 5.25 attendance points.[4] This mandated the assessment of a verbal warning pursuant to the attendance policy.

On June 29, 2014, Leads Brandon Lawrence and Zeth Edsall met with Mooneyhan to deliver a verbal warning and implement a Performance Improvement Plan ("PIP"). Lawrence and Edsall conducted the meeting because it is standard practice for two employees to be present during disciplinary assessments, and they were the two Leads available at the time. It is also standard practice for such meetings to occur in an office, rather than the call center floor, for the employee's privacy and benefit. In substance, the PIP was a restatement of NewWave attendance policy.

Shortly after the verbal warning was delivered to Mooneyhan, at 5:46 p.m., she sent an email to Mark Whitehead and Treka Hargrove titled "2 weeks[sic] notice" in which she

---

[4] Mooneyhan disputes that she had accrued 5.25 attendance points at that time, and contends that at least two of these points were assessed erroneously. This dispute is immaterial to the resolution of Defendant's Motion.

expressed frustrations with the attendance policy and purported to resign her employment. The email stated, in part, "[A]nyways the point is I do like work but only if everyone is in agreement with punishment…" and "So I just figured I should give you my 2 weeks, I was told if I miss work any more I will get fired anyways so I would rather end it on good terms…" Four minutes later, Mooneyhan sent another email to Whitehead and Hargrove that read, "Oh sorry one more thing, I really do like working here, I just want this point thing explained because to me it doesn't make since [sic]." Less than thirty minutes later, she sent a third email, which stated, "I don't want to quit I just want to understand this." Fourteen minutes after that, she sent a fourth email retracting her resignation, apologizing for her misunderstanding and for being upset, and assuring her supervisor and manager she would "do [her] best to make sure I don't miss any work." She concluded that email with "thanks" and a smiley-face emoticon.[5]

On July 3, 2014 at 5:19 p.m., Mooneyhan sent an email to Hargrove and Cathy Johnson (a Sales and Service Lead) regarding a change in her schedule the weekend of the July 4th holiday. Instead of working July 4, she was to work a double, split-shift on Sunday, July 6. She thanked them for the switch, wished them a "happy 4th" and included a smiley-face emoticon.

### *Mooneyhan's Resignation/Termination and Allegations of Harassment*

On July 6, 2014, Mooneyhan left work during her first scheduled shift and did not return to work at NewWave thereafter. Mooneyhan alleges that she resigned her employment with NewWave on July 6, 2014, because Edsall harassed her "that day again." NewWave contends that she was terminated pursuant to the attendance policy on July 8, after incurring two points under the policy for "no-call, no-show" absences on July 7 and July 8.

---

[5]Mooneyhan admits that she sent the emails but claims that they were sent at Lawrence's direction.

On July 8, 2014, Mooneyhan spoke with Staci Gowan, HR Director, by phone. This was the first time that Mooneyhan had spoken with Gowan on any subject. Mooneyhan was driving to her attorney's office when she placed the call. Mooneyhan complained about the behavior of several NewWave employees, and included allegations of sexual harassment. At the end of the call, Mooneyhan informed Gowan that she could no longer speak to anyone "without [her] attorney present" and hung up the phone. Mooneyhan declined to provide a written statement of her complaints of harassment as requested by Gowan or otherwise cooperate in an investigation of her allegations.

In the July 8, 2014 call with Gowan, Mooneyhan complained of the following behavior by her co-workers:

- Leah used her cell phone while at her desk
- Marilyn Deline often used the "f word"
- Brandon Lawrence kept his computer up for other employees to use
- Larry Reed allowed his pants to sag
- Lamar Griffin rubbed other women's shoulders (but she did not report he did this to her)
- On June 29 and July 6, Edsall directed sexual comments both to herself and to co-worker Marilyn Deline. Edsall made a total of three verbal comments to her that she claimed were sexual harassment.

Mooneyhan filed a Charge of Discrimination ("Charge") on February 11, 2015, which is the first written account of her allegations received by NewWave. In her Charge, Mooneyhan alleged that she was subjected to sexual harassment by multiple male employees, but she did not refer to any of the alleged harassers by name. Mooneyhan for the first time alleged that the harassment extended back to May 2, 2014, shortly after she began working for NewWave. She also claimed for the first time that she was touched inappropriately. The Charge references a disciplinary meeting in which she was allegedly subjected to sexual comments, and she "quickly left the room."

Gowan conducted a full investigation of Mooneyhan's allegations. She interviewed Edsall, who denied making sexual comments in the workplace. Gowan also interviewed Deline, whom Mooneyhan alleged was a witness/co-victim of the sexual harassment by Edsall on Sunday, June 29 and Sunday, July 6. Deline denied ever hearing any sexual comments by Edsall, and noted that she did not even work on Sundays. Gowan instructed all interviewed employees on proper reporting, management, and violations of NewWave's anti-harassment policy. Because Mooneyhan's allegations of sexual harassment remained unsubstantiated, no one at NewWave was disciplined.

### *Mooneyhan's Complaint*

In the instant Complaint, Mooneyhan alleges that Edsall sexually harassed and/or assaulted her on numerous occasions, including the following:

a. On or about May 2, 2014, Edsall began discussing Mooneyhan's makeup and told Mooneyhan he found her physically attractive.

b. A few days later, Edsall again conversed with Mooneyhan regarding her physical appearance, discussed the size of her breasts and how he was physically attracted to her.

c. On another occasion, Mooneyhan sought help with a telephone call from Edsall who was the only supervisor available. Edsall again discussed matters of a sexual nature, showed Mooneyhan his split tongue and told her he had it surgically split to perform oral sex, and asked Mooneyhan if he could rub her legs.

d. On another occasion, Edsall made sexual comments to Mooneyhan, telling her he could fix her stress by having sex with her and asking Mooneyhan to have sex with him.

e. On another occasion, Mooneyhan was walking with another female employee, Marilyn Deline, when Edsall approached and told them his fantasy was to have Mooneyhan and Deline both on top of him having sex.

f. On another occasion, Edsall and Brandon Lawrence, another male supervisor, escorted Mooneyhan to an office regarding a verbal warning. Upon entering the office, Lawrence sat on the desk in front of Mooneyhan and Edsall locked the door behind her. Edsall said there needed to be two males in the room because of rumors around the office that Mooneyhan was having sex with them.

g.     On or about July 3, 2014, Edsall tightly grabbed Mooneyhan by the arm and rubbed it up and down and begged Mooneyhan not to quit her job.

h.     On or about July 6, 2014, Edsall approached Mooneyhan and suggested they go into the break room and pay each other to climb on the tables and take off their clothes.

i.     On multiple other occasions during her employment with Defendant, Edsall told Mooneyhan his sexual advances were Mooneyhan's fault because she wore makeup.

j.     On multiple other occasions, Edsall made other sexually suggestive comments about Mooneyhan's body and the size of her breasts, and requested multiple times that Mooneyhan engage in a sexual encounter with him.

Mooneyhan claims that the following incidents involving Brandon Lawrence occurred during her employment:

a.     During Mooneyhan's first monitoring session with Lawrence, Lawrence reached between Mooneyhan's legs to turn off her headset.

b.     On another occasion, while again being monitored on telephone calls by Lawrence, Lawrence told Mooneyhan he was attracted to her and reached to adjust a microphone for telephone calls while rubbing his hand and arm across Mooneyhan's breast. Lawrence then dropped the microphone on the floor and reached between Mooneyhan's legs to retrieve it.

c.     The following day, Lawrence and Edsall escorted Mooneyhan to an office regarding a verbal warning. Upon entering the office, Lawrence sat on the desk in front of Mooneyhan and Edsall locked the door behind her. Edsall said there needed to be two males in the room because of rumors around the office that Mooneyhan was having sex with them.

In addition, Mooneyhan alleges that "other male employees and/or supervisors of Defendant" sexually harassed her on the following occasions:

a.     Engaging in sexual conversations including discussions of pornography in Mooneyhan's presence.

b.     Making comments about Mooneyhan's makeup, physical body, and breasts.

c.     Telling Mooneyhan they were "watching her" and pressuring Mooneyhan to have a "moment" alone with them.

d.     Rubbing Mooneyhan's neck and attempting to unfasten her bra strap.

**IV.     Discussion**

"Title VII prohibits employers from discriminating based on sex with respect to compensation, terms, conditions, or privileges of employment." *Jenkins v. Winter,* 540 F.3d 742, 748 (8th Cir. 2008) (citing 42 U.S.C. § 2000e-2(a)(1)).  "Discrimination based on sex that creates a hostile or abusive working environment violates Title VII." *Jenkins,* 540 F.3d at 748 (citing *Brenneman v. Famous Dave's of Am., Inc.,* 507 F.3d 1139, 1143 (8th Cir. 2007), *quoting Weger v. City of Ladue,* 500 F.3d 710, 718 (8th Cir. 2007)).  "A hostile work environment arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Anda v. Wickes Furniture Co., Inc.,* 517 F.3d 526, 531 (8th Cir. 2008) (citation omitted).

The Supreme Court explained that under Title VII, an employer's liability for an employee's harassment of another employee may depend on the status of the harasser:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a "supervisor," however, different rules apply.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id.,* at 807, 118 S.Ct. 2275; *Ellerth, supra,* at 765, 118 S.Ct. 2257.  Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker. We hold that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim. . .

*Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).

To establish a prima facie hostile work environment claim for co-worker harassment, Mooneyhan must prove: (1) she was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the

protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Jenkins*, 540 F.3d at 748, citing *Anda,* 517 F.3d at 531. Harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)).

NewWave argues that Mooneyhan is unable to demonstrate the fourth or fifth elements of a hostile work environment claim. Mooneyhan responds that a genuine issue of material fact exists as to whether she suffered a constructive discharge, which would satisfy the fourth element. As to the fifth element, Mooneyhan contends that she reported instances of harassment to Cathy Johnson, who could be reasonably expected to report the conduct to the appropriate management.

In its Reply, NewWave notes that Mooneyhan's Complaint does not plead a constructive discharge claim. NewWave argues that, to the extent Mooneyhan's constructive discharge claim is viable under the pleadings, it lacks merit.

### A.     Constructive Discharge

As NewWave points out, Mooneyhan does not specifically plead a constructive discharge claim. Because the pleadings reveal that it is Mooneyhan's intent to plead such a claim, the undersigned will analyze whether she has set forth sufficient evidence to support a constructive discharge claim.

"To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Blake v. MJ Optical Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) (citations omitted). An objective standard is applied to determine whether a constructive discharge occurred. *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 858 (8th Cir. 1998). An employee claiming constructive discharge shoulders a substantial burden. *MJ Optical*, 870 F.3d at 826, citing *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 820-11 (8th Cir. 2008).

The Eighth Circuit "has consistently recognized that an employee is not constructively discharged if she 'quits without giving [her] employer a *reasonable* chance to work out a problem.'" *Id.*, citing *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 460 (8th Cir. 2011) (alteration in original, emphasis added) (quoting *Brenneman v. Famous Dave's of Am., Inc*., 507 F.3d 1139, 1144 (8th Cir. 2007). "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." *Smith v. Goodyear Tire & Rubber Co.,* 895 F.2d 467, 473 (8th Cir. 1990), citing *Garner v. Wal-Mart Stores, Inc*., 807 F.2d 1536, 1539 (11th Cir. 1987) (emphasis in original). "Failure to seek a resolution before quitting. . .is fatal to [a] constructive discharge claim." *MJ Optical*, 870 F.3d at 826 (citations omitted).

Mooneyhan claims that there is sufficient evidence for a jury to conclude that she was constructively discharged because any person would find the complained of harassment intolerable. Mooneyhan cites her deposition testimony, in which she described the following instances of harassment: she was propositioned for sex three times by Zeth Edsall; Brandon Lawrence twice used reaching for work equipment as an excuse to inappropriately touch her body; multiple male employees touched her in a number of ways, including rubbing her arm,

legs, and neck; a male employee asked what her bra size was; another employee tried to unhook her bra; Lawrence made numerous comments about her breasts; and Edsall and Lawrence made a comment about having sex together in the room in which they took her to sign a disciplinary form. (Doc. 30 at 6; 28-3 at 30, 33, 35-36, 39, 40, 43.) She further argues that, based on her "repeated attempts to report her harassment to numerous employees of Defendant," she was justified in believing there was no chance at fair treatment. (Doc. 30 at 6.)

The undersigned finds that, even accepting the alleged instances of harassment as true, Mooneyhan has failed to support a constructive discharge claim. Although the parties dispute whether Mooneyhan resigned on July 6, 2014, or was terminated on July 8, 2014, this factual dispute is immaterial to the resolution of this claim. Assuming for the purposes of the instant Motion that Mooneyhan quit on July 6 as she claims, the record does not support her allegation that she was forced to quit due to harassment so severe as to create an objectively hostile or abusive work environment.

First, Mooneyhan has failed to produce evidence that any employee at NewWave intended for her to quit. Her testimony demonstrates that both Lawrence and Edsall expressed the opposite intent. Specifically, Mooneyhan testified that Edsall begged her not to quit on July 3, 2014, just three days before she resigned. (Doc. 28-3 at 40-41.) She claims that Lawrence told her to type the June 29 emails because he was "afraid [she] was going to get fired" for her attendance points. *Id.* at 22.

Second, Mooneyhan cannot show that her work conditions were objectively hostile. In order to meet this requirement, Mooneyhan must demonstrate that she gave her employer a reasonable opportunity to correct the problem. Mooneyhan claims that she reported some of the alleged harassment to Cathy Johnson in person, and that she believed Johnson was to report the

comments to Summer Dunker, the Call Center Administrative Assistant. Johnson was employed as a Lead, the same position as Lawrence and Edsall. Johnson denies ever receiving a report of sexual harassment from Mooneyhan. (Doc. 28-13 at 9-11.) Johnson indicated that, if she had received such a report, she would have immediately reported it to Whitehead, Hargrove, or the HR Department. *Id.* at 15. Regardless, Johnson was not a "supervisor in charge" as designated by the NewWave anti-harassment policy to receive sexual harassment complaints.

Mooneyhan admits that she never reported the alleged sexual harassment to Whitehead, Hargrove, or HR. She claims that she attempted to discuss the matter with Whitehead in person on two different occasions, but each time Whitehead indicated he did not have time to talk to her. Specifically, Mooneyhan states that she approached Whitehead when he was leaving the office to play golf; and on a subsequent occasion, she approached Whitehead when he had stopped in the office briefly when he was not scheduled to work. *Id.* at 36-37. Mooneyhan claims that, in each instance, she stated to Whitehead "Can I ask you a question?" and Whitehead indicated he did not have time to answer questions. *Id.* Mooneyhan testified that she never had the opportunity to tell him that her questions pertained to allegations of sexual harassment. *Id.* Whitehead testified that he did not recall either of these encounters with Mooneyhan. (Doc. 28-12 at 20.) It is undisputed, however, that Mooneyhan ultimately never informed Whitehead of the subject of her inquiry during these in-person encounters. She made no additional efforts to contact Whitehead by email, or any other means, to report her allegations.

Mooneyhan also claims that she reported an instance of harassment to David Norton. At the time, Norton was employed by NewWave as an Employee Development Specialist. Norton denied ever receiving a complaint of harassment from Mooneyhan. (Doc. 28-14 at 6.) In any event, Norton was not a "supervisor" to which complaints of harassment were to be directed

under NewWave's anti-harassment policy. Norton testified that he would "occasionally" sit in on an interview and give input, but was "never given the authority to absolute hire or anything like that." (Doc. 31-4 at 17-18.)

The first time Mooneyhan reported the conduct to the HR Department was when she called Staci Gowan on July 8, 2014, after her resignation. In addition to accusations of sexual harassment by Edsall, Mooneyhan complained about various actions of her co-workers that were rather innocuous and not of a sexual nature (*i.e*., other staff members: using cuss words, wearing saggy pants, and using a cell phone at their desk), and complained of the NewWave attendance policy. Mooneyhan did not previously report the physical conduct of which she now complains to the HR Department. The record shows that Mooneyhan's allegations have progressively grown in number and extent, from the time she first reported misconduct to Gowan to the filing of her Charge of Discrimination, and then from the Charge of Discrimination to the filing of the instant action. Although Gowan requested that Mooneyhan provide a written statement of her complaints of harassment, Mooneyhan declined, noting that she could no longer speak to anyone without her attorney present.

Mooneyhan's deposition testimony conclusively establishes that she did not give NewWave a reasonable opportunity to correct the problem:

> Q: And the handbook policy says, if you are not satisfied with the response when you go to a supervisor, come to HR, right?
> A: Right.
> Q: And you didn't do that?
> A: Yes. I didn't feel the need to do that because [Johnson] was supposed to take care of it for me.
> Q: Except she didn't take care of it for you. You weren't satisfied with any response that had been done. Assuming that she had done something and Zeth was told to knock it off, it wouldn't have been satisfactory because he kept doing it, right?
> A: Right.
> Q: In fairness?
> A: He did keep doing it, yes.

Q:  So you weren't satisfied with whatever had been done with the first complaint, right?
A:  Right.
Q:  And the policy said if you're not satisfied, go to HR, right?
A:  That's true.
Q:  And you didn't do that, did you?
A:  I did not.

(Doc. 28-3 at 39.)

Mooneyhan's claim that she was forced to resign her employment because she had repeatedly attempted to report the harassment to NewWave employees unsuccessfully lacks merit.  Mooneyhan frequently communicated with NewWave management, including Whitehead and Hargrove, on issues as minor as scheduling changes.  Despite Mooneyhan's demonstrated ability to communicate by email with appropriate NewWave management, not once did she send an email to the same individuals reporting the alleged harassment.  Significantly, even when Mooneyhan finally reported the harassment to Gowan, her allegations were not nearly as extensive as they are in the instant action.  The fact that Mooneyhan called Gowan to report the harassment the day after she resigned illustrates that she knew the proper channels to report sexual harassment pursuant to NewWave policy, however, chose not to avail herself of them until after her resignation.

Mooneyhan has not met her significant burden of producing evidence demonstrating constructive discharge.  *See Fercello v. County of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010) ("[t]he bar to relief, however, is high" for constructive discharge (citing *O'Brien,* 532 F.3d at 810-11).  Even assuming Mooneyhan's allegations of misconduct are true and the misconduct was sufficiently egregious, there is no evidence that NewWave intended Mooneyhan to resign or that Mooneyhan gave NewWave the opportunity to correct the problem.  *See Trierweiler*, 639 F.3d at 461 ("We have consistently recognized that an employee is not constructively discharged

if she 'quits without giving [her] employer a reasonable chance to work out a problem.'")

(alteration in original) (quoting *Brenneman*, 507 F.3d at 1144).

Thus, NewWave is entitled to judgment as a matter of law on Mooneyhan's constructive

discharge claim.

### B. Hostile Work Environment

A hostile work environment claim can exist even absent a constructive discharge. *See*

*Winspear v. Community Development, Inc.*, 574 F.3d 604, 607 (8th Cir. 2009). NewWave

argues that it is entitled to judgment as a matter of law on Mooneyhan's hostile work

environment claim because Mooneyhan cannot prove thyepe fourth or fifth elements that are

required. The fourth element requires that the harassment affected a term, condition, or privilege

of employment, and the fifth element requires that NewWave knew or should have known about

the harassment and failed to take proper remedial action. *Jenkins*, 540 F.3d at 748, citing *Anda,*

517 F.3d at 531. Specifically, NewWave contends that Mooneyhan's behavior establishes that

her co-workers' conduct was not sufficiently severe or pervasive as to alter the terms or

conditions of her employment. NewWave further argues that Mooneyhan cannot establish that

NewWave management knew or should have known of the alleged harassment and failed to take

remedial action. In addition, NewWave argues that it is entitled to judgment as a matter of law

on the basis of the *Faragher-Ellerth* affirmative defense.

The Court will assume, as the parties do, that Mooneyhan has satisfied the first three

elements of a hostile work environment claim and focus on the fourth and fifth elements. If a

plaintiff demonstrates harassment by a supervisor sufficient to satisfy the prima facie case of

hostile work environment, the employer is vicariously liable for the harassment unless it can

establish the affirmative defense set forth in *Faragher v. Boca Raton,* 524 U.S. 775 (1998), and

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998). When no tangible employment action is taken, an employer can raise the affirmative defense, which requires proof by a preponderance of the evidence (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise. *See Faragher,* 524 U.S. at 807. For the reasons discussed below, the Court finds that Mooneyhan has not established a hostile work environment.

### 1.    Status of Alleged Harassers

As an initial matter, the Court must determine if Mooneyhan's alleged harassers were supervisors or mere co-workers. The question is important because "[u]nder Title VII, an employer's liability for such harassment may depend on the status of the harasser." *Vance,* 133 S.Ct. at 2439. "For supervisor harassment, [a plaintiff] must prove only the first four elements to establish a prima facie case. If a prima facie case is shown, the employer is vicariously liable unless it demonstrates that it is entitled to the *Ellerth–Faragher* affirmative defense." *Jenkins*, 540 F.3d at 748-49.

The United States Supreme Court held that "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 133 S.Ct. at 2443 (internal quotation marks and citation omitted). "The ability to direct another employee's tasks is simply not sufficient." *Id.* at 2448. The Court thus turns to an examination of the facts of this

case, to determine whether Mooneyhan's alleged harassers possessed the power to take tangible employment actions against Mooneyhan.

The primary individuals accused of harassment—Lawrence and Edsall[6]—were "Leads." Mooneyhan argues that Leads were supervisors because they had authority to assist with hiring, and to discipline employees with regard to attendance issues.

NewWave describes Leads as call center agents with more experience and expertise than entry-level associates, who are paid an hourly wage and are compensated at a slightly higher rate than new associates. They help answer new associates' questions and take customer calls that have escalated. Leads are sometimes informally referred to as "supervisors," such as when a customer on the phone asks to "speak with a supervisor." NewWave argues that Leads had no authority to hire, fire, promote, transfer, modify benefits, or otherwise alter the terms and conditions of another employee's employment with NewWave. Rather, NewWave contends that all actions of the Leads require approval and direction of Hargrove or Whitehead.

The Court finds that Lawrence and Edsall were not "supervisors" as set out by *Vance*.[7] Lawrence testified that he had no discretion in the imposition of discipline regarding attendance or the development of a PIP. (Doc. 28-8 at 16-17.) He stated that when the automatic system indicated that an employee had accrued a certain number of points, he was required to issue a PIP and verbal warning. *Id.* Lawrence further testified that he lacked authority to approve shift changes, and that all schedule changes had to be approved by Hargrove. *Id.* Similarly, Edsall testified that "someone higher up than us would determine who needed to be reprimanded and at

---

[6]Although Mooneyhan identifies other alleged harassers—some by name, others just generally as "other male employees"—she does not claim any of these individuals were supervisors other than Lawrence and Edsall.

[7]As a result, the Court does not reach the issue of whether NewWave is entitled to the *Faragher/Ellerth* affirmative defense.

that point we would fill out a PIP and take that agent outside with another lead and let them know what they were doing wrong." (Doc. 28-9 at 6-7.) The undisputed facts show that Leads lacked the authority to independently alter the terms and conditions of another employee's employment with NewWave. *See Humphrey v. Dresser-Rand Co.*, No. 2:12CV32JCH, 2013WL4805804, *5 (E.D. Mo. Sept. 9, 2013) ("job site supervisors" were merely co-workers "because they lacked authority to take tangible employment actions against Plaintiff").

Although the Court has found Mooneyhan's alleged harassers were not supervisors, she may still prevail by showing that NewWave was negligent in failing to prevent harassment from taking place. *Vance*, 133 S.Ct. 2453. In other words, Mooneyhan must prove all five elements of a hostile work environment claim, rather than the first four required to show supervisor harassment.

### 2. Prima Facie Case

The fourth element of a hostile work environment claim involves both objective and subjective components. *Duncan v. General Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002). The harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment" and the victim must subjectively believe her working conditions have been altered. *Harris,* 510 U.S. at 21-22. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *Duncan,* 300 F.3d at 934. "There is no bright line between sexual harassment and merely unpleasant conduct ...." *Hathaway v. Runyon,* 132 F.3d 1214, 1221 (8th Cir. 1997). Courts view the "totality of the circumstances" in determining whether there is a hostile work environment. *Klein v. McGowan,* 198 F.3d 705, 709 (8th Cir. 1999). Relevant factors in determining whether conduct rises to the level of harassment

include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job. *Duncan,* 300 F.3d at 934. "The standard is a demanding one, and '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not suffice." *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010) (quoting *Arraleh v. Cnty. of Ramsey,* 461 F.3d 967, 979 (8th Cir. 2006)).

Mooneyhan argues that the alleged harassing conduct by NewWave employees was objectively severe and pervasive enough to alter a term, condition, or privilege of employment. As support, she sets out the following allegations: she was propositioned for sex three times by a male co-worker, was told that it was a male co-worker's fantasy to have a threesome with her and another female employee, a co-worker rubbed her neck, she was cornered in a room and told rumors of sex were about to start, she had to endure numerous comments about her breasts, a male colleague used reaching for work equipment as an excuse to touch her legs, a co-worker bragged about his ability to please a woman with his surgically split tongue, and she was asked about her pornography-viewing habits. (Doc. 30 at 11.)

The Eighth Circuit has affirmed the grant of summary judgment in favor of the employer based on the plaintiff's failure to meet the fourth element of a hostile work environment claim under similar circumstances. *See, e.g. LeGrand v. Area Resources for Community and Human Servs.*, 394 F.3d 1098, 1100 (8th Cir. 2005) (harasser's actions including asking employee to watch pornographic videos and "jerk off with him," grabbing employee's buttocks, reaching for his genitals, briefly gripping his thigh, and attempting to kiss him "ranged from crass to churlish and were manifestly inappropriate," but did not create a hostile work environment" ); *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 977-80 (8th Cir. 2003) (co-worker's conduct was

inappropriate but not sufficiently severe or pervasive where it included calls to the plaintiff's home, frequent visits to her office, discussions about relationships with his wife and other women, touching the plaintiff's arm, saying he loved her, placing romance novels in her faculty mailbox, and invading her personal space).

Even if the conduct Mooneyhan describes was severe and pervasive enough to be actionable, Mooneyhan has not established that she subjectively perceived her work conditions were abusive. Mooneyhan must establish not only that "the offending conduct created an objectively hostile work environment [but also] that she subjectively perceived her working conditions as abusive." *Bowen v. Missouri Dep't of Soc. Servs.,* 311 F.3d 878, 883 (8th Cir. 2002) (quoting *Williams v. City of Kansas City,* 223 F.3d 749, 753 (8th Cir. 2000)).

The undisputed facts reveal that Mooneyhan spoke with Brandon Lawrence about her then-accumulated attendance points on May 22, 2014. After her discussion with Lawrence, she emailed Mark Whitehead with a question Lawrence could not answer. (Doc. 28-5 at 2.) She concluded this email to Whitehead with a smiley-face emoticon. *Id.* She made no reference to harassment of any kind in the email to Whitehead. On June 29, 2014, Lawrence and Edsall met with Mooneyhan to deliver a verbal warning and implement a PIP. Mooneyhan claims that Lawrence and Edsall made sexual remarks to her during this meeting. Shortly after the meeting, Mooneyhan sent an email to Whitehead and Treka Hargrove titled "2 weeks [sic] notice," in which she expressed her frustrations with the attendance policy and purported to resign her employment. (Doc. 28-5 at 10.) She remarked in the email, "I do like work," but indicated that she would rather end her employment on good terms than get fired for attendance points. *Id.* Mooneyhan sent a series of three additional emails, in which she retracted her resignation, stated "I really do like working here," and concluded the email with "thanks" and another smiley-face

emoticon. (Doc. 28-5 at 10, Doc. 28-7 at 1.) Mooneyhan did not mention the alleged

harassment that had occurred that day during the PIP meeting. On July 3, 2014, Mooneyhan sent

an email to Hargrove and Cathy Johnson regarding a change in her schedule the weekend of the

July 4th holiday. (Doc. 28-5 at 11.) In this email, she thanked them for allowing the switch,

wished them a "happy 4th," and included a smiley-face emoticon. *Id.*

Mooneyhan's communications with NewWave management undermine her claim that

she subjectively believed that her working conditions were abusive. Mooneyhan regularly

communicated with NewWave management over minor issues during the same time she now

alleges she was subjected to abusive harassment, yet she never mentioned the alleged

harassment. Instead, Mooneyhan specifically stated in emails to NewWave management that she

liked her job, and concluded the emails with smiley-face emoticons. When considering the time

period in which these communications were sent, they are inconsistent with Mooneyhan's

subjective belief that she was experiencing abuse forcing her to quit. *Woodland v. Joseph T.*

*Ryerson & Son, Inc.,* 302 F.3d 839, 844 (8th Cir. 2002) (affirming summary judgment for the

employer, and holding that plaintiff's decision not to report many of the complained-of incidents

and evidence that he declined his manager's offer to fire the offending co-worker was "strong

evidence that, while offensive, these incidents did not subjectively affect the conditions" of

plaintiff's employment"). Viewing the totality of the circumstances, no reasonable juror could

believe that the alleged harassment was so subjectively severe or pervasive as to rise to the level

of an actionable hostile work environment.

Even assuming Mooneyhan can establish the first four elements of the prima facie case,

she presents no evidence to demonstrate the fifth element: That NewWave knew or should have

known of the alleged harassment prior to July 8, 2014 and failed to take remedial action. As the

Court stated in *Vance*, "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." 133 S.Ct. at 2453.

"[W]here an employer has a complaint procedure delineating the individuals to whom notice of harassment must be given," actual notice is established when the employee notifies those individuals. *Weger v. City of Ladue,* 500 F.3d 710, 721 (8th Cir. 2007) (citation omitted). "'Constructive notice, on the other hand, is established when the harassment was so severe and pervasive that management reasonably should have known of it.'" *Id.* (*citing Watson v. Blue Circle, Inc.,* 324 F.3d 1252, 1259 (11th Cir. 2003)).

Mooneyhan does not dispute that NewWave has an anti-harassment policy setting out the procedure to report harassment, and that she signed the policy when she started her employment. Mooneyhan did not report the alleged harassment to Whitehead or Hargrove, the individuals designated under the policy to receive complaints of sexual harassment. She never sent an email to any NewWave employee complaining about sexual harassment. Mooneyhan did not contact Gowan or any other HR representative with a complaint of sexual harassment before July 8, 2014. Because the record is devoid of any indication that Mooneyhan invoked NewWave's harassment complaint procedure prior to her resignation, NewWave did not have actual notice of the alleged harassment until July 8, 2014.

Mooneyhan, citing *Sandoval v. American Bldg. Maint. Indust., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009), argues that knowledge of the alleged sexual harassment can be imputed to NewWave because Mooneyhan reported some instances of harassment to Cathy Johnson. She contends that Johnson was someone who could "reasonably be expected to report or refer a complaint to someone who can put an end to" the alleged harassment. *Id.*

24

Mooneyhan's reliance on *Sandoval* is misplaced. *Sandoval* distinguished actual and

constructive notice as follows:

> In the context of sexual harassment claims, "[a]ctual notice is established by proof
> that management *knew* of the harassment." *Watson v. Blue Circle, Inc.,* 324 F.3d 1252,
> 1259 (11th Cir. 2003) (emphasis added). Whereas, constructive notice "is established
> when the harassment was so severe and pervasive that management reasonably *should*
> have known of it." *Id.* (emphasis added); *see also Martin v. Wal-Mart Stores, Inc.,* 183
> F.3d 770, 772 (8th Cir. 1999) (noting an employer is deemed to have actual notice of a
> dangerous condition if an employee created or was aware of the hazard). "Constructive
> notice ... is established when the harassment was so severe and pervasive that
> management reasonably should have known of it." *Watson,* 324 F.3d at 1259. "[A]n
> employer may be charged with constructive knowledge of previous sexual harassment ...
> if the harassment was so broad in scope, and so permeated the workplace, *that it must
> have come to the attention of someone authorized to do something about it." Fall v. Ind.
> Univ. Bd. of Tr.,* 12 F. Supp.2d 870, 882 (N.D. Ind.1998) (emphasis added) (citations
> omitted).
> [T]here can be constructive notice in two situations: where an employee provides
> management level personnel with enough information to raise a probability of sexual
> harassment in the mind of a reasonable employer, or where the harassment is so
> pervasive and open that a reasonable employer would have had to be aware of it.
> ...
> [T]hese standards strike the correct balance between protecting the rights of the employee
> and the employer by faulting the employer for turning a blind eye to overt signs of
> harassment but not requiring it to attain a level of omniscience, in the absence of actual
> notice....
> *Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 294 (3d Cir. 1999).

578 F.3d at 802. The *Sandoval* panel reversed the district court's grant of summary judgment on

the basis that it refused to consider evidence of past sexual harassment claims, *id.,* a factual

consideration that is not present in this case.

Detrimental to Mooneyhan's argument is the *Sandoval* panel's conclusion that the

plaintiff employee's complaints of harassment to on-site supervisors, who were found to be co-

employees, were "insufficient to put [the employer] on notice of the harassment, especially in

light of the extensive anti-harassment policy and procedures it had established, which, when

accessed, ended the harassment." *Id.* at 801.

Mooneyhan has failed to create a genuine issue of material fact regarding whether NewWave was negligent in failing to prevent harassment. She presents no evidence to show that NewWave's anti-harassment policy was ineffective. Mooneyhan does not dispute that, as soon as she notified HR of the alleged harassment pursuant to NewWave's anti-harassment policy, NewWave conducted a prompt investigation of the claims. Mooneyhan does not allege that she ever conveyed her allegations of harassment to a supervisor delineated by the policy to receive sexual harassment complaints prior to July 8, 2014. Her alleged complaints to Johnson and Norton, non-supervisors, do not constitute constructive notice.

Moreover, Mooneyhan has failed to present evidence for a reasonable jury to conclude that the alleged harassment "was so broad in scope, and so permeated the workplace, *that it must have come to the attention of someone authorized to do something about it*." *Sandoval*, 578 F.3d at 802, citing *Fall v. Ind. Univ. Bd. of Tr.*, 12 F. Supp.2d 870, 882 (N.D. Ind. 1998) (emphasis in original). Mooneyhan has not introduced testimony from any NewWave employee indicating that they witnessed any of the alleged instances of harassment. *Cf. Delgado v. GGNSC Grand Island Lakeview LLC*, 4:15CV3124, 2017 WL 1533376, * 7 (D. Neb. April 27, 2017) (evidence sufficient for jury to find harassment was so pervasive as to constitute constructive knowledge when plaintiff presented testimony from several witnesses who either experienced the alleged harassment, witnessed it, or heard about it). The one co-victim of sexual harassment Mooneyhan identifies—Marilynn Deline—denies that the incident involving a remark by Edsall regarding his sexual fantasy involving Deline, Mooneyhan, and Edsall ever occurred. (Doc. 28-15 at 8.) In fact, Deline testified that she did not even work on Sundays, the day on which Mooneyhan claimed the incident occurred. *Id.* at 9.

In sum, Mooneyhan has not established a prima facie case of hostile work environment. In so finding, the Court does not condone the alleged behavior of Lawrence and Edsall, and the other unidentified males. Because Mooneyhan did not report this conduct to the designated supervisor or HR official prior to her resignation, there is no evidence that NewWave should have known about the alleged co-worker harassment. Consequently, NewWave cannot be liable for the alleged hostile work environment as a matter of law; and judgment will be entered in favor of NewWave on this claim.

## V.      Defendant's Motion to Strike

Also pending before the Court is Defendant's Motion to Strike/Bar Plaintiff's Amended Rule26(a) Initial Disclosures, Amended Answers to Interrogatories, and Identification of Mr. Walter Johnston, FNP. (Doc. 21.) In this Motion, NewWave states that Mooneyhan submitted Amended Rule26(a) Initial Disclosures and Amended Answers to Interrogatories approximately three weeks after the discovery deadline, in which she identifies: two new witnesses, additional information from disclosed witnesses, and new allegations from Mooneyhan inconsistent with her deposition testimony. NewWave requests that the Court strike this evidence and bar any evidence not disclosed prior to the discovery deadline. NewWave further argues that Mooneyhan should be precluded from submitting medical expenses as an element of her damages.

Mooneyhan did not rely on any of the new evidence at issue in her Response to Defendant's Motion for Summary Judgment. In light of the Court's granting of Defendant's Motion for Summary Judgment, Defendant's Motion to Strike will be denied as moot.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment

(Doc. 26) is **granted**.  A separate Judgment in favor of Defendant will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike/Bar Plaintiff's Amended Rule26(a) Initial Disclosures, Amended Answers to Interrogatories, and Identification of Mr. Walter Johnston, FNP (Doc. 21) is **denied as moot**.


**/s/** Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of November, 2017.